David W. Brown - 5671
Attorney for Plaintiffs
2880 West 4700 South, Suite F
Salt Lake City, Utah 84129
Telephone: (801) 964-6200
Law.davidwbrown@gmail.com

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ITN FLIX, LLC, a Utah Limited Liability Company; and GIL MEDINA, an Individual;<br><br>Plaintiffs,<br><br>v.<br><br>UNIVISION HOLDINGS, INC., a New York Corporation; UNIVISION SALT LAKE CITY, LLC; UNIVISION COMMUNICATIONS, INC., a Delaware Corporation; and EL REY NETWORK, LLC,<br><br>Defendants. | **COMPLAINT**<br><br><br>(Demand for Jury Trial)<br><br>Case No.2:15-cv-00736 CW |

Plaintiffs ITN Flix, LLC ("ITN") and Gil Medina ("Medina") (Medina and ITN collectively, "Plaintiffs"), by and through their attorney of record, hereby allege as follows:

## JURISDICTION AND VENUE

1. The Court has original subject matter jurisdiction over the claims set

forth in this Complaint pursuant to 28 U.S.C. § 1332 and on the grounds there is complete diversity of citizenship between Plaintiffs and all Defendants and the amount in controversy exceeds 75,000.

2. The Court has personal jurisdiction over the Defendants in that they regularly do business within this District, and because a substantial portion of the relevant acts complained of herein occurred in the State of Utah and this District.

3. Venue is proper in the United States District Court for the Central District of Utah pursuant to 28 U.S.C. § 1391(a) and (c) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

4. Plaintiff ITN is and at all times relevant hereto was a limited liability company organized under the laws of the State of Utah and with its principal place of business in Salt Lake City, Utah. ITN is and at all times relevant hereto was an independent production company, in the business of producing, promoting and exploiting entertainment products, including without limitation films and games. Among other things, ITN is the successor-in-interest to 8th Sister Films, LLC, a Utah limited liability company, and to ITN, LLC, also a Utah limited liability company.

5. Plaintiff Gil Medina is and at all times relevant hereto was a citizen of the State of Utah, residing in Davis County and/or Salt Lake County, Utah and is and at all relevant times has been a citizen of the United States. Among other things, Medina was and is an independent film maker, with credits as a producer, writer and director, in

addition to being a principal and managing member of ITN and its predecessors-in-interest. "Jack's Law" and "Vengeance" were written by Medina and filmed in Utah.

6. References to Plaintiffs herein refer to and include Plaintiffs' predecessors-in-interest.

7. Univision Holdings, Inc., a New York corporation, is the owner of Spanish language television network Univision Network.

8. Univision Communications, Inc., has paired with and invested in the English-language El Rey Television Network that is geared to young viewers. The El Rey Network has a mix of reality, scripted, music and sports programming, along with movies.

9. Univision's Utah office is located at 5140 West Amelia Earhardt Drive, Suite C, Salt Lake City, Utah 84116, where it owns and operates television station KUTH-DT, channel 32.

10. El Rey Network LLC, a cable network, was created and run by film maker Robert Rodriguez, who is the founder and chairman of the network. Their principal place of business is in Austin, Texas.

11. The El Rey Network has national distribution through Comcast, which is supporting a group of minority-owned networks.

12. Univision's partnership with El Rey Network is part of its growing coverage in both languages and its focus on the ultimate appeal to Hispanic tastes and preferences. The Univision Defendants and the El Rey Network are broadcasting,

televising or distributing shows and programs throughout the state of Utah.

13. Plaintiffs and Medina, a Mexican-American film maker, have been impacted financially by Defendants. Univision has used and promoted Rodriguez as the bridge between English speaking and non-English speaking Hispanics, including taking creative ideas from Mexican Americans such as Plaintiff Medina.

14. Machete Kills, LLC, is a Texas limited liability company. Machete Kills is a film production company which was involved with the production and financing of the feature film "Machete Kills."

15. El Chingon, Inc., is a Texas corporation. El Chingon is a film financing and/or production company which was involved with the production and financing of the feature film "Machete Kills."

16. Troublemaker Studios, L.P., is a Texas limited partnership. Troublemaker is, *inter alia*, a film production company which was involved with the production and financing of the "Machete" film franchise starring Danny Trejo.

17. Quick Draw Productions, LLC, is a Texas limited liability company with its principal place of business in Austin, Texas. Quick Draw is, *inter alia*, a film production company which was involved with the production and financing of the "Machete" film franchise starring Danny Trejo.

18. Plaintiffs are informed and believe and thereon allege that, with respect to at least some of the wrongful conduct alleged herein, each defendant aided and abetted each other defendant in committing said wrongful conduct. Each

4

defendant is therefore so liable for the acts, omissions and conduct of each other defendant.

## BACKGROUND AND FACTUAL BASIS FOR CLAIMS

19. In or about 2004, Medina met actor Danny Trejo while Trejo was in Utah performing acting services in "The Crow: Wicked Prayer." Medina and Trejo soon became friends. At that time and continuing into 2005, Trejo was a character actor, with credits in film, television and other entertainment properties -- but he was not a star seen by the industry as capable of carrying a film or other project in the lead role. By 2005, Trejo had worked on multiple occasions with Robert Rodriguez on film projects; however, the vast majority of Trejo's credits by that time were on projects not involving Rodriguez. By 2005, while Trejo, with his striking, rugged visage and background as a convicted felon, had become a recognizable player in character and other supporting roles, he had never been cast in or marketed as the lead actor in a scripted feature film or film franchise: his potential as a lead action star was as yet unrecognized, including by Rodriguez and others. Trejo had not transcended his status as a character actor to become the star of an action feature film franchise. And by 2005, Trejo had entered his sixties. He was running out of time to become an action hero lead, if that was ever going to happen for him.

20. By 2005, Plaintiffs had a vision that Trejo could serve as the lead actor and anchor of a vigilante action feature film franchise centered around his distinctive look, style, inherent and authentic toughness, charisma and other special traits. In

short, Plaintiffs saw by 2005 that Trejo could be much more than he had been given the opportunity to be in the entertainment industry up until that time -- if someone would place a bigger bet on Trejo and build a franchise around him.

21. In or about 2005, Medina approached Trejo and presented Trejo with an opportunity for Trejo to be the lead in an action feature film franchise built around a vigilante character to be portrayed by Trejo in multiple films, with Plaintiffs providing creative talent, financing, and entertainment business acumen and other resources to drive forward such a Trejo-centered entertainment franchise, and from which Trejo would receive a substantial share of the financial proceeds.

22. Trejo was excited and enthusiastic about the project. Medina wrote a script and Plaintiffs provided financing and other resources. Trejo used personal connections to secure a cast with recognizable credits and otherwise lent his energies and acting services to the project. By the Fall of 2005, Plaintiffs had produced a rough cut of a vigilante action feature film with Trejo in the starring role. The film had the working title "Jack's Law", later changed to "Vengeance" aka "Danny Trejo's Vengeance" (including as later re-shot and re-edited and otherwise modified in different versions, the "Vigilante/Trejo Film").

23. On or about November 3, 2005, Plaintiffs and Trejo delivered a copy of the script and a DVD of the Vigilante/Trejo Film to Rodriguez, and proposed that Rodriguez or his companies take on the project and build a vigilante action feature film franchise around Trejo. Plaintiffs are informed and believe and on that basis allege that

in or about late 2005, Rodriguez examined the script and DVD of the Vigilante/Trejo Film. In or about late 2005, Rodriguez and others (either directly or through a representative) communicated to Plaintiffs and/or Trejo that Rodriguez was not interested in such a project.

24.     Rejected by Rodriguez and others, Plaintiffs and Trejo created an entire Trejo-centered vigilante action film franchise themselves, with the original working title "Jack's Law," and later sometimes referred to by Plaintiffs and Trejo as the "Vengeance" franchise ("Vigilante/Trejo Film Franchise Project").

25.     In or about 2005 and 2006, Plaintiffs and Trejo came to a meeting of the minds and entered into agreements to complete one or more films.

26.     Plaintiffs continued to develop, produce and promote a Trejo-centered vigilante franchise, including producing, financing and continuing to re-shoot, re-edit and otherwise improve the first of their films: "Vengeance" (aka "Jack's Law" and also aka "Danny Trejo's Vengeance") – which indeed featured Trejo in his first lead role.

27.     A theater-ready version of the Vigilante/Trejo Film was completed by early 2006, and had limited theatrical exhibitions that year in a few small markets. By 2006 the Vigilante/Trejo Film existed as a showcase – and first example – of what was possible with Trejo in a starring role as a vigilante action star.

28.     Plaintiffs timely registered the film, first as "Jack's Law" and then as "Vengeance," with the applicable copyright offices.

29.     Plaintiffs are informed and believe and thereon allege that some time

7

between 2007 and 2009, Rodriguez and others became interested in developing, producing, directing and otherwise exploiting a vigilante action film franchise and entertainment property centered around Trejo in the lead role.

30. Plaintiffs are informed and believe and thereon allege that through these communications, Rodriguez and others agreed and conspired to take the opportunity of a Trejo vigilante action franchise for Rodriguez and others, without dealing with or even contacting Plaintiffs, to undermine and destroy the relationship between Trejo and Plaintiffs, to undermine, damage and destroy Plaintiffs' reputation and standing in the entertainment industry, and otherwise to make it impossible for the Vigilante/Trejo Film Franchise Project to succeed.

31. In or about 2007, Rodriguez and others directed and produced a limited, low-risk, one-toe-in-the-water experiment with Trejo as a vigilante action hero lead: around his "Planet Terror" film released as part of the *Grindhouse* double feature with Quentin Tarantino, Rodriguez included a short, fake trailer of a then-nonexistent film called "Machete," purportedly featuring Trejo as a vigilante action hero lead -- clearly similar to the concept of Plaintiffs' "Vengeance."

32. In 2009, induced by Rodriguez and others, Trejo agreed to star in and commenced filming "Machete," a full-length theatrical motion picture featuring Trejo in the lead role as a vigilante. This film duplicated much of the Plaintiffs' original films and was substantially similar to Plaintiffs' "Vengeance."

33. "Machete" was released in 2010 and was commercially and critically

successful. "Machete" earned $26.6 million in the United States and $44.1 million worldwide.

34. On or about October 2013, a sequel, "Machete Kills," was released; it is another film remarkably similar in many ways to Plaintiffs' original films.

35. Defendants have actively promoted, displayed, and broadcast the "Machete" and "Machete Kills" movies to the public.

36. Defendants have shown these movies publicly on their respective networks, all to the detriment of Plaintiffs, thereby infringing on Plaintiffs' copyrights.

## FIRST CLAIM FOR RELIEF
### Copyright Infringement (17 U.S.C. § 102)

37. Plaintiffs reallege and reincorporate by reference each and every allegation contained in the paragraphs above, as though fully set forth herein.

38. Copyright, a form of intellectual property law, protects original works of authorship including literary, dramatic, musical, and artistic works, such as poetry, novels, movies, songs, computer software, and architecture.

39. Copyright protection subsists in original works of authorship fixed in tangible medium of expression, from which they can be perceived, reproduced or otherwise communicated. Works of authorship include motion pictures and other audiovisual works or recordings.

40. At all times material hereto, Plaintiffs possessed valid copyrights on their films, "Jack's Law" and "Vengeance."

41. Plaintiffs have, and still possess, a legal and beneficial interest in the

exclusive rights under a copyright to their two films.

42. Under 17 U.S. C. § 106(1-5) of the Copyright Act, Plaintiffs, as the copyright owners, have the exclusive rights to do and authorize any of the following: ... to reproduce the copyrighted work ... to prepare derivative works ...to distribute copies ... of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending ... to perform the copyrighted work publicly ...[and] to display the copyrighted work publicly.

43. Plaintiffs have never authorized Defendants to publicly show "Machete" and "Machete Kills."

44. The films "Machete" and "Machete Kills" copied protected components or portions of Plaintiffs' copyrighted material. These films copied constituent elements of the Plaintiffs' films which were original.

45. The copied portions of Plaintiffs' films are protected expressions of such importance to the copied work that the appropriation is actionable.

46. The producers of the "Machete" and "Machete Kills" films had access to the copyrighted works, and there are probative similarities between the copyrighted material and the allegedly copied material.

47. The substantial similarities include but are not limited to the following:

A.  Vengeance is about a police officer who takes "vengeance" on the bad guy who killed his wife and daughter. He takes vengeance by searching out the bad guys through information obtained on the streets.
B.  Machete is about a federal officer who takes "vengeance" on the bad guy who killed his wife and daughter. He takes vengeance by searching out the bad guys through information obtained on the streets.

C.         The finale scene in Vengeance is between a priest and a bad guy.
D.         The finale scene in Machete is between a priest and a bad guy, and duplicates the scene that was filmed for Vengeance in 2005.
E.         Vengeance was written in 2004 and filmed in 2006 (with minor filming additions taking place in 2009 and 2010), the original title of Vengeance was Jack's Law.
F.         Machete was filmed in 2009 with a 2010 release date.
G.         The lead actor in Vengeance was Danny Trejo and was the first movie Trejo ever filmed as a lead actor in a movie.
H.         The lead actor in Machete was Danny Trejo and was the first movie released with Trejo as the lead.
I.         The movie's popularity was based in large part on the fact that it was Trejo's first lead role.

48.   Since 2005, "Jack's Law" and "Vengeance" have been produced and originated by Plaintiffs, all copies of the movies have been made by them or under their authority or license, and have been made in strict conformity with the provisions of the Copyright Act and all other laws governing copyright.

49.   Since at least 2005. Plaintiffs have been and still are the sole proprietor of all rights, title, and interest in and to the copyrighted movies.

50.   Beginning in 2010 and each year thereafter, Defendants infringed upon said copyright by placing upon the public market the "Machete" movies, which were largely copied from Plaintiffs' copyrighted movies.

51.   Plaintiffs created, wrote and produced the original works, "Jack's Law" and "Vengeance" in the state of Utah.

52.   Plaintiffs' films contain a large amount of material wholly original with Plaintiffs and are copyright able subject matter under the laws of the United States.

53. At all times material hereto, Plaintiffs complied in all respects with the Copyright Act (17 U.S.C. § 102 et seq.) and all other laws governing copyright, and secured the exclusive rights and privileges in and to the copyright of said films.

54. Defendants supported, promoted and participated in the copyright violations by showing and airing the "Machete" and "Machete Kills" films on their public airwaves.

55. Plaintiffs suffered resulting damages from Defendants' perpetuation of these copyright infringements by the broadcasting of these two films.

56. Since 2010, Defendants have been televising, broadcasting and otherwise marketing the "Machete" films, and have thereby been engaging in unfair trade practices and unfair competition against Plaintiffs to Plaintiffs's irreparable damage.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the following relief:

On their claim for relief against the Defendants, jointly and severally:

1. Actual and compensatory damages in an amount according to proof at trial, but exceeding $75,000;

2. Punitive damages;

3. Costs of suit, including reasonable attorneys fees;

4.     Such other relief as is equitable and just and/or that the Court may grant.

## DEMAND FOR JURY TRIAL

Plaintiffs ITN FLIX, LLC and GIL Medina, by and through their attorney, hereby demand a trial by jury of all matters and issues triable to a jury.

DATED this 12th day of October, 2015.

/s/ David W. Brown

David W. Brown

Attorney for Plaintiffs