IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ITN FLIX, LLC, a Utah limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>UNIVISION TELEVISION GROUP, INC., a Delaware corporation; UNIVISION HOLDINGS, INC., a New York corporation; UNIVISION SALT LAKE CITY, LLC; UNIVISION COMMUNICATIONS, INC., a Delaware corporation; and EL REY NETWORK, LLC,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER DENYING MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT**<br><br>Case No. 2:15-cv-00736-DN-DBP<br><br>District Judge David Nuffer<br>Magistrate Judge Dustin B. Pead |

This memorandum decision and order addresses whether a copyright infringement claim should be dismissed against media broadcasters who broadcasted a motion picture over their networks. The allegations show that the broadcasters did not create the allegedly infringing work which was broadcasted and did not broadcast the copyrighted work. The copyright infringement claim need not be dismissed. Broadcasters who distribute an infringing work may be held liable for infringing the distribution right of the copyrighted work even if they did not participate in the creation of the infringing work.

Defendants Univision Television Group, Inc.; Univision Salt Lake City, LLC; Univision Communications, Inc.; and El Rey Network, LLC (collectively "Broadcaster Defendants") move

to dismiss the Second Amended Complaint[1] under Rule 12(b)(6) ("Motion").[2] Plaintiff ITN Flix, LLC ("ITN") opposes the Motion ("Opposition").[3] The Broadcaster Defendants filed a reply in support of the Motion ("Reply").[4] For the reasons below, the Motion is DENIED.

## BACKGROUND

In October 2015, ITN and Mr. Gil Medina filed a complaint for copyright infringement against Univision Holdings, Inc.; Univision Salt Lake City, LLC; Univision Communications, Inc.; and El Rey Network, LLC ("Original Defendants" which are comprised of all the Broadcaster Defendants[5] except Univision Television Group, Inc.).[6]

Four months later, in February 2016, ITN and Mr. Medina filed an amended complaint under Rule 15(a) which also asserted a single cause of action against the Original Defendants for copyright infringement.[7] The amended complaint alleged, among other things, that ITN held a valid copyright to a motion picture originally titled *Jack's Law*, later titled *Vengeance*. The amended complaint alleged that Mr. Robert Rodriguez, the founder and chairman of Defendant El Rey Network, obtained access to *Vengeance* in 2005, and that he later made a film entitled *Machete* that infringed ITN's copyright for *Vengeance*. But the amended complaint alleged only

---

[1] Second Amended Complaint, docket no. 46, filed Nov. 8, 2016.

[2] Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) ("Motion"), docket no. 53, filed Dec. 6, 2016.

[3] Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) ("Opposition"), docket no. 62, filed Jan. 17, 2017.

[4] Reply in Support of Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) ("Reply"), docket no. 67, filed Jan. 31, 2017.

[5] Defendant Univision Holdings, Inc. is not a moving party because, according to the Broadcaster Defendants, Univision Holdings, Inc. has not been served with a copy of the Second Amended Complaint. Motion at i, n. 1.

[6] Complaint, docket no. 2, filed Oct. 13, 2015.

[7] Amended Complaint, docket no. 12, filed Feb. 16, 2016.

three similarities between *Vengeance* and *Machete*, and failed to allege sufficient facts establishing that the Original Defendants infringed ITN's copyright.[8]

The order dismissing the first amended complaint held that the copyright infringement claim could not stand because there were insufficient allegations of access and insufficient allegations of similarity between *Vengeance* and *Machete*.[9] But the order also explained that "there is a significant question whether Rodriguez's alleged access in 2005 provides an adequate link . . . to El Rey Network or any of the other Broadcasters" for purposes of copyright infringement.[10]

The order further explained that the amended complaint alleged that *Vengeance* was re-shot and re-edited after it was provided to Mr. Rodriguez in 2005. Thus, third party access could not be inferred because *Vengeance* evolved into a non-identical work from the version provided to Rodriguez.[11] There was no allegation in the first amended complaint that the copy of *Vengeance* provided to Mr. Rodriguez in 2005 was the same as the final version.

The first amended complaint was dismissed and leave was granted to file a second amended complaint by November 21, 2016.[12]

On November 8, 2016, ITN filed the Second Amended Complaint currently under review. The Second Amended Complaint removes Gil Medina as a plaintiff; adds Univision

---

[8] *Id.*

[9] Memorandum Decision and Order Granting Motion to Dismiss ("45 Order") at 6-10, [docket no. 45](docket no. 45), filed Nov. 2, 2016.

[10] *Id.* at 5-6.

[11] *Id.* at 6-7.

[12] *Id.* at 12.

Television Group, Inc. as a defendant; and, like the original complaint and the first amended complaint, asserts a single cause of action for copyright infringement.[13]

The Second Amended Complaint adds significant allegations that make it meaningfully different from the amended complaint that was dismissed. Among other things, the Second Amended Complaint includes over fifty alleged similarities between *Vengeance*—the copyrighted work—and *Machete*—the allegedly infringing work.[14] The Second Amended Complaint also alleges that:

- "Rodriguez acknowledged . . . that he copied and used material from *Vengeance* and offered to pay . . . for his use of *Vengeance*"[15] and

- even though "minor edits" were made to *Vengeance* when it was re-shot and re-edited, "the material given to Rodriguez was identical to the finalized *Vengeance* in all material aspects."[16]

The Broadcaster Defendants move to dismiss the Second Amended Complaint, arguing that the Second Amended Complaint "fails to rectify the pleading deficiencies addressed in the Court's November 2, 2016 Order . . . ."[17] The Broadcaster Defendants are incorrect.

## MOTION TO DISMISS STANDARD

Dismissal under Rule 12(b)(6) is appropriate when the complaint, standing alone, is legally insufficient to state a claim for which relief may be granted.[18] When considering a motion to dismiss for failure to state a claim, the thrust of all well-pleaded facts is presumed, but

---

[13] Second Amended Complaint ¶¶ 54-76.

[14] *Id.* ¶¶ 37-53.

[15] *Id.* ¶ 31.

[16] *Id.* ¶ 20.

[17] Motion at i.

[18] *See Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999).

4

conclusory allegations need not be considered.[19] A court is not bound to accept the complaint's legal conclusions and opinions, whether or not they are couched as facts.[20] "A 12(b)(6) motion should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."[21]

## FACTUAL ALLEGATIONS[22]

The Second Amended Complaint makes the following factual allegations:

In or about 2004, Mr. Gil Medina met actor Danny Trejo.[23] Mr. Trejo had never been cast as a lead actor in a scripted feature film or film franchise.[24] In 2005, Mr. Medina approached Mr. Trejo about serving as "the lead actor and anchor of a vigilante action feature film franchise centered on his distinctive look, style, inherent and authentic toughness, charisma, and other special traits."[25] ITN, an independent production company of which Mr. Medina is a principal and managing member, would provide creative talent, financing, entertainment business acumen, and other resources.[26] Mr. Trejo agreed to participate.[27]

### *Vengeance*

"By the fall of 2005, [ITN] and Trejo had produced a rough cut of a vigilante action feature film with Trejo in the starring role. The film had the working title *Jack's Law*, later

---

[19] *See Cory v. Allstate Ins.*, 583 F.3d 1240, 1244 (10th Cir. 2009).

[20] *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). *See also Brown v. Zavaras*, 63 F.3d 967, 972 (10th Cir. 1995).

[21] *Sutton*, 173 F.3d at 1236.

[22] The allegations provided in this section derive from the Second Amended Complaint. For purposes of this memorandum decision and order, the plaintiff's factual allegations are assumed to be true.

[23] Second Amended Complaint ¶ 15.

[24] *Id.* ¶ 15.

[25] *Id.* ¶¶ 15, 16.

[26] *Id.* ¶ 17.

[27] *Id.* ¶ 18.

5

changed to *Vengeance* . . . ."[28] "On or about November 4, 2005," ITN and Mr. Trejo delivered "a copy of the script and a DVD of . . . *Vengeance* to Rodriguez." Mr. Rodriguez is the founder and chairman of Defendant El Rey Network.[29]

"Although minor edits were later made to the script and rough-cut DVD given to Rodriguez, the material given to Rodriguez was identical to the finalized *Vengeance* in all material aspects, including the same plot, characters, pace, mood, dialogue, setting, and sequence of events."[30] ITN suggested that Mr. Rodriguez or his companies put their name on the project to improve the reputation of the movie, and suggested that Mr. Rodriguez collaborate with ITN to build a vigilante action feature film franchise centered on Mr. Trejo.[31] Mr. Rodriguez examined the script and the DVD, but declined ITN's offers.[32]

A theater-ready version of *Vengeance* was completed in early 2006.[33] ITN registered the film "with the applicable copyright offices," first as *Jack's Law* in 2005 and then as *Vengeance* in 2010, receiving registration numbers 3 Pau 3-559-647 and Pau 3-527-726.[34]

### *Machete*

In or about 2007, Mr. Rodriguez directed and produced a trailer of a film called *Machete*, a vigilante action hero movie featuring Mr. Trejo as the lead actor.[35] In 2009, Mr. Rodriguez,

---

[28] *Id.*

[29] *Id.* ¶ 9.

[30] *Id.* ¶ 20.

[31] *Id.* ¶ 21.

[32] *Id.*

[33] *Id.* ¶ 24.

[34] *Id.* ¶¶ 25-27.

[35] *Id.* ¶ 28.

6

Mr. Trejo, and others commenced filming *Machete*.[36] Mr. Rodriguez "subsequently provided *Machete* to the Broadcaster Defendants for distribution and public display."[37]

*Machete* was released in theaters in 2010, earning approximately $26 million in the United States and $19 million internationally. *Machete* also made approximately $22 million in "home market earnings."[38] The Broadcaster Defendants "actively promoted, displayed, broadcasted, and distributed *Machete* to the public" and "showed *Machete* publicly on their respective networks, all to the detriment of [ITN], thereby infringing on [ITN]'s copyrights."[39]

In 2011, Mr. Trejo "confronted Rodriguez about Rodriguez's copying of *Vengeance* in making *Machete*. Rodriguez acknowledged to Trejo and Medina that he copied and used material from *Vengeance* and offered to pay Medina for his use of *Vengeance*. However, Rodriguez later refused to pay."[40]

**Alleged Similarities Between *Vengeance* and *Machete***

The back of *Machete*'s DVD case describes the plot of *Machete*. It states:

Set up, double-crossed and left for dead, Machete (Trejo) is an ass-kicking ex-Federale who lays waste to anything that gets in his path. As he takes on hitmen, vigilantes and a ruthless drug cartel, bullets fly, blades clash and the body count rises. Any way you slice it, **vengeance** has a new name – *Machete*.[41]

Both films involve Mr. Trejo acting as an ex-law-enforcement officer whose wife and daughter are murdered.[42] He is left for dead but survives and ultimately obtains revenge on the

---

[36] *Id.* ¶ 30.

[37] *Id.*

[38] *Id.* ¶ 32.

[39] *Id.* ¶¶ 35, 36.

[40] *Id.* ¶ 31.

[41] *Id.* ¶ 38 (emphasis added by ITN).

[42] *Id.* ¶¶ 39, 40.

7

men who killed his family and injured him.[43] While seeking revenge, the Mr. Trejo's character defends vulnerable people who are threatened by villains.[44]

"Each movie contains a scene, similar in the time-stop and sequence of events of the movies, where the protagonist [Mr. Trejo's character] is sitting alone, reminiscing of his murdered family, having flashbacks of his family's murder, and vowing revenge."[45] Each of "these scenes express the same moods of loss, darkness, pain, depression and revenge."[46]

"In each movie, the main villain inflicts severe injuries on the protagonist and believes the protagonist to be dead only later to discover the protagonist is alive and seeking revenge."[47]

"In each movie, the protagonist is offered a large sum of money by a villain but the protagonist refuses to personally keep the money."[48] This expresses the idea that the protagonist is motivated by a sense of justice and revenge and is unconcerned with monetary rewards.[49]

"In each movie, the protagonist has an opportunity to engage in sexual conduct with a vulnerable female but he refuses to do so."[50] This expresses the idea that the protagonist is motivated by a sense of justice and revenge and will not take advantage of the weak or vulnerable.[51]

---

[43] *Id.*

[44] *Id.*

[45] *Id.* ¶ 43.

[46] *Id.*

[47] *Id.* ¶ 44.

[48] *Id.* ¶ 45.

[49] *Id.*

[50] *Id.* ¶ 46.

[51] *Id.*

8

Each movie portrays the protagonist struggling between what is legal and what is moral or just from the protagonist's perspective. The result is that the protagonist breaks the law to bring justice.[52]

Both films involve a well-developed law enforcement character who investigates the protagonist, and then ultimately joins forces with the protagonist in violently opposing the villains.[53] In *Vengeance*, the character is named Ron Banks played by Robert Burke. In *Machete*, the character is Sartana Rivera played by Jessica Alba.[54]

Both films portray the protagonist as religious. Both films show the protagonist visiting a priest in a church to talk about his situation and to seek help. Both films show the protagonist wearing a crucifix.[55]

Both films portray the protagonist as generous. In *Vengeance*, the protagonist pays a lady for a car and gives her more money than she is asking in an effort to assist her. In *Machete*, the protagonist gives a large amount of cash to a character to assist poor immigrants.[56]

Both films have a similar pace and sequence of events.[57] Several other similarities are alleged, including, among other things, that the subtitles in both films are yellow and in thick font; the story line in both films is communicated vocally by a character; a villain appears on scene wearing a cowboy hat and leather jacket; a Caucasian villain speaks to Hispanic characters

---

[52] *Id.* ¶ 47.
[53] *Id.* ¶ 48.
[54] *Id.*
[55] *Id.* ¶ 50.
[56] *Id.* ¶ 51.
[57] *Id.* ¶ 53.

in heavily accented Spanish; villains drive a Mercedes S550; and the protagonist's costuming is a black leather jacket, a black t-shirt, hair down.[58] There are many other alleged similarities.[59]

## DISCUSSION

The foundational test for copyright infringement is whether the plaintiff can establish (1) ownership of a valid copyright and (2) copying of constituent elements of the work that are original.[60] To withstand a motion to dismiss, the complaint, viewed in the light most favorable to ITN, must contain adequate factual allegations supporting each of these elements.[61]

### ITN Adequately Alleges Ownership

Ownership of a valid copyright is not challenged and has been adequately alleged. ITN alleges that it owns a valid copyright on its film *Vengeance*, having registered it "with the applicable copyright offices" in 2005 and 2010 and receiving registration numbers 3 Pau 3-559-647 and Pau 3-527-726.[62] "A Certificate of Registration, if timely obtained, constitutes prima facie evidence of the validity of the copyright."[63] Thus, the first element is adequately alleged.

### ITN Adequately Alleges Copying

"Copying is . . . a shorthand reference to *any infringement* of the copyright holder's exclusive rights that are set forth at 17 U.S.C. § 106."[64] Those exclusive rights are:

(1) to reproduce the copyrighted work in copies or phonorecords;

---

[58] *Id.*

[59] *Id.* ¶¶ 38-53.

[60] *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *La Resolana Architects, PA v. Reno, Inc.*, 555 F.3d 1171, 1177 (10th Cir. 2009); *Palladium Music, Inc. v. EatSleepMusic, Inc.*, 398 F.3d 1193, 1196 (10th Cir. 2005); *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 942 (10th Cir. 2002); *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 831 (10th Cir. 1993).

[61] *Jacobsen*, 287 F.3d at 941-42.

[62] Second Amended Complaint ¶¶ 25-27, 55, 56.

[63] *Gates Rubber*, 9 F.3d at 832.

[64] *Id.* at 832 n. 6 (emphasis added).

> (2) to prepare derivative works based upon the copyrighted work;
>
> (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;
>
> (4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;
>
> (5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and
>
> (6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.[65]

"Copying" may be established "either through the presentation of direct evidence, or through indirect evidence that shows (1) that the defendant had access to the copyrighted [work], and (2) that there are probative similarities between the copyrighted material and the allegedly copied material."[66] "Direct proof of copying is rare, and plaintiffs will typically rely on the indirect method of proof."[67]

The prior order dismissing the first amended complaint noted that the first amended complaint had not alleged "direct copying" and that to establish the element of copying, the first amended complaint would have to contain sufficient allegations" of "indirect copying." The elements required to establish "indirect copying" are "[a] that the defendant had access to the copyrighted [work], and [b] that there are probative similarities between the copyrighted material and the allegedly copied material."[68] The order went on to conclude that access had not been

---

[65] 17 U.S.C. § 106.

[66] *Gates Rubber*, 9 F.3d at 832.

[67] *Id.* at 833.

[68] 45 Order at 4 (quoting *Gates Rubber*, 9 F.3d at 833).

adequately alleged, and there were not sufficient allegations of "striking similarity" to infer access.[69]

ITN now argues that it "does not need to provide evidence that Defendants had access to *Vengeance*."[70] "Rather," ITN argues, it simply needs to show "that *Rodriguez* had access and impermissibly copied *Vengeance* by making *Machete*, and that Defendants then distributed and displayed *Machete* to the public in direct violation of [ITN]'s copyrights."[71] ITN argues that "[c]lear statute and precedent dictate that any member in the chain of distribution is strictly liable for copyright infringement based on one party's access and copying of protected material."[72]

The Broadcaster Defendants argue that there are no grounds to hold them liable for copyright infringement because they did not have access to *Vengeance* and did not participate in the creation of *Machete*.[73]

After thorough review, ITN is correct that the Second Amended Complaint sufficiently alleges a copyright infringement claim based on the "chain of distribution" theory. A distributor, publisher, or broadcasters may be liable for copyright infringement if they have disseminated a work that has copied protected elements of a plaintiff's copyright—even if the distributor, publisher, or broadcaster did not know that the work they were disseminating was an infringing work. Several cases explained below support this conclusion.[74]

---

[69] 45 Order at 6, 7.

[70] Opposition at 4 n. 3.

[71] *Id.* (emphasis added).

[72] *Id.* at 6.

[73] Motion at 3-6; Reply at 4-6.

[74] *See also Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distributors Pty. Ltd.*, 647 F.2d 200, 207 (D.C. Cir. 1981) (stating that in "copyright infringement cases, any member of the distribution chain can be sued as an alleged joint tortfeasor"); *Toksvig v. Bruce Pub. Co.*, 181 F.2d 664 (7th Cir. 1950) (affirming judgment against publisher); and *MCA, Inc. v. Wilson*, 425 F. Supp. 443, 456 (S.D.N.Y. 1976) (holding defendant distributor liable even though it had "no personal knowledge" of the infringement).

In *Metal Morphosis, Inc. v. Acorn Media Publishing, Inc.*,[75] Metal Morphosis, a company that created a unique piece of jewelry, sued Acorn for infringing Metal Morphosis's copyright on that piece of jewelry.[76] Acorn argued that it could not be liable for copyright infringement because it was an "innocent purchaser" of the allegedly infringing item, and it merely distributed and sold the allegedly infringing item on its website.[77] The court disagreed, noting that "[w]rongful distribution of copyrighted works constitutes direct infringement and not contributory or vicarious infringement."[78] "The Copyright Act does not require that the infringer know that he is infringing but it nonetheless requires conduct by a person who causes in some meaningful way an infringement."[79] Because the defendant had "engaged in conduct which contributed to infringement (even if innocently)," the plaintiff was allowed to "proceed against anyone in the chain of distribution for infringement."[80] "[I]f the manufacture of a copy . . . constitutes an infringement of the reproduction or adaptation right, *its distribution will infringe the distribution right* . . . even if the distributor in acquiring ownership of the copy . . . had no notice of plaintiff's copyright."[81] *Metal Morphosis* further explained that "[t]his approach may seem unfair to 'innocent resellers.' Nonetheless, the Copyright Act prioritizes recovery . . . to protect against insolvent or unavailable reproducers over fairness to downstream distributors. The Defendant is subject to liability as a distributor."[82] The Broadcaster Defendants' focus on

---

[75] *Metal Morphosis, Inc. v. Acorn Media Publishing, Inc.*, 639 F. Supp. 2d 1367 (N.D. Ga. 2009).

[76] *Id.* at 1370.

[77] *Id.* at 1372.

[78] *Id.*

[79] *Id.* (alterations omitted).

[80] *Id.*

[81] *Id.*

[82] *Id.* at 1373.

the "exact copy" language in *Metal Morphosis*[83] ignores that the defendant in *Metal Morphosis* *did not take part in the creation of the alleged infringing work.*[84]

Likewise, in *Hamil America, Inc. v. GFI*,[85] J.C. Penney, a defendant who distributed garments containing infringing fabric patterns, was held liable for "willfully infring[ing] Hamil America's copyright" even though J.C. Penney apparently had no knowledge that the fabric design had been infringed and apparently did not take part in the creation of the allegedly infringing fabric.[86]

In *Jacobsen v. Deseret Book Co.*, the Tenth Circuit reversed dismissal of a copyright infringement suit against an allegedly infringing author and the author's publisher.[87] The Tenth Circuit explained that the test for whether the author *and the author's publisher* could be held liable for copying the copyrighted work was whether the allegedly infringing *author* copied the copyrighted work.[88] The Tenth Circuit wrote:

> Whether Dr. Hughes [the allegedly infringing author] *and Deseret Book* [the allegedly infringing author's publisher] copied *Who Refused to Die* [the copyrighted work] "involves two distinct inquiries: first, whether [Dr. Hughes], as a factual matter, copied [Dr. Jacobsen's] work, and second, whether, as a mixed issue of fact and law, those elements that were copied were protected.[89]

Thus, in *Jacobsen*, the Tenth Circuit held that a suit should not be dismissed against a *publisher* if it can be shown that the author—a person other than the publisher—copied the copyrighted work. That is, the Tenth Circuit did not require that the *publisher* created the allegedly infringing

---

[83] Reply at 7 (quoting *Metal Morphosis*, 639 F. Supp. 2d at 1374).

[84] *Metal Morphosis*, 639 F. Supp. 2d at 1370 (explaining that defendant obtained the allegedly infringing item "from Brown County Silver").

[85] *Hamil Am. v. GFI*, 193 F.3d 92 (2d Cir. 1999).

[86] *Id.* at 97.

[87] *Jacobsen*, 287 F.3d at 955.

[88] *Id.* at 942.

[89] *Id.*

work. The allegation that the publisher *participated in the distribution of the allegedly infringing work* was enough to avoid dismissal.

The Broadcaster Defendants "do not dispute that a copyright owner may proceed against anyone in the chain of distribution for infringement[,]" but argue that the element of access cannot be ignored.[90] The Broadcaster Defendants argue that because there is no allegation that the Broadcaster Defendants had access to *Vengeance*, ITN has failed to state a claim for copyright infringement. The Broadcaster Defendants draw a distinction between copyright infringement cases where there is "direct duplication of the copyrighted work" and this case, where the Broadcaster Defendants have not directly duplicated the copyrighted work, but have simply distributed a work that is alleged to have infringed on the copyrighted work.[91]

The Broadcaster Defendants are correct that this case is different than cases where a distributor sells an exact duplicate of the copyrighted work without authorization.[92] It is not alleged that the Broadcaster Defendants aired *Vengeance* without authorization. But that does not mean that ITN has failed to state a claim against the Broadcaster Defendants. As the cases above illustrate, a copyright infringement claim can stand against a distributor even if the distributor had no knowledge of the alleged infringement.

The Tenth Circuit's instruction in *Jacobsen*, quoted above, is helpful. To determine whether the alleged infringer *and* the alleged infringer's publisher were liable for "copying," the focus was placed on the party who created the allegedly infringing work—in *Jacobsen*, the author. The first inquiry was "whether [the alleged infringer], as a factual matter, copied [the

---

[90] Reply at 4.

[91] *Id.* at 7.

[92] *See Leonard v. Stemtech Int'l, Inc.*, 834 F.3d 376 (3d Cir. 2016); *Columbia Pictures Television, Inc. v. Krypton Broadcasting of Birmingham, Inc.*, 259 F.3d 1186, 1189-90 (9th Cir. 2001); *Playboy Enters., Inc. v. Starware Pub. Corp.*, 900 F. Supp. 433, 438 (S.D. Fla. 1995).

15

copyright owner's] work, and second, whether, as a mixed issue of fact and law, those elements that were copied were protected.[93] Under this analysis, ITN is correct that it has adequately alleged the element of direct copying under these inquiries, and access does not need to be shown because access is a method of proving indirect copying. "Wrongful distribution of copyrighted works constitutes *direct infringement* and not contributory or vicarious infringement."[94] ITN has alleged that Mr. Rodriguez "copied and used material from *Vengeance* and offered to pay Medina for his use of *Vengeance*."[95] Thus, the first inquiry under *Jacobsen* has been alleged.

The second inquiry under *Jacobsen* has also been adequately alleged. The Second Amended Complaint identifies several ways in which *Machete* is alleged to have copied protected elements of *Vengeance*.[96] Unlike the first amended complaint that alleged only three similarities, the Second Amended Complaint alleges dozens of similarities with regard to costumes, scenery, theme, mood, pace, sequence, specific lines of script, and characters.[97] These new allegations describe more than general plot similarities. They sufficiently allege that *Machete* copied protectable elements of *Vengeance*, especially considering that Mr. Rodriguez is alleged to have viewed *Vengeance* and admitted to copying it.

If any of the alleged similarities were to be viewed in isolation, copyright infringement may not be established against the Broadcaster Defendants. But "it is ordinarily important to

---

[93] *Jacobsen*, 287 F.3d at 942.

[94] *Metal Morphosis*, 639 F. Supp. 2d at 1372 (emphasis added).

[95] Second Amended Complaint ¶ 31.

[96] *Id.* ¶¶ 38-53.

[97] *Id.*

16

compare the whole works,"[98] not just view individual alleged similarities in isolation.[99] "Where there is strong proof of access, the necessary showing of factual similarity will be relatively lower."[100] Additionally, the threshold for creativity is "very low" and there only needs to be "some minimal degree of creativity" for a work to have protectable elements.[101]

Considering as true the allegations in the Second Amended Complaint and viewing the factual allegations in the light most favorable to ITN, the Second Amended Complaint adequately states a claim for copyright infringement against the Broadcaster Defendants. ITN has not simply compiled a random list of similarities scattered throughout the works, but has identified specific similarities with regard to costumes, scenery, theme, mood, pace, sequence, specific lines of script, and characters.[102]

The Broadcaster Defendants are correct that the moods of loss, darkness, pain, and revenge are not copyrightable.[103] But ITN does not attempt to copyright those moods. Rather, ITN's allegations seek protection for the *manner of expression* of those moods—for example, the use of flashbacks and the similarities in the sequence of events in the overall script.

Thus, even though ITN does not allege that the Broadcaster Defendants were responsible for *creating* the allegedly infringing work, ITN has sufficiently alleged its copyright infringement claim by alleging that someone in the chain of distribution (Mr. Rodriguez) copied

---

[98] The Broadcaster Defendants invite the court to "review Vengeance and Machete" rather than the allegations in the Second Amended Complaint. Reply at 3, n.2 (quoting *Jacobsen*, 287 F.3d at 941-42). But *Jacobsen* does not state that review of the original work and the allegedly infringing work is mandatory. Instead, *Jacobsen* stated: "*When* a district court considers the original work . . . ." *Jacobsen*, 287 F.3d at 941. Accordingly, *Vengeance* and *Machete* have not been reviewed in their entirety. Only the Second Amended Complaint, Motion, Opposition, Reply, and related exhibits have been considered.

[99] *Madrid v. Chronicle Books*, 209 F. Supp. 2d 1227, 1238 (D. Wyo. 2002).

[100] *Id.*

[101] *Kindergartners Count, Inc. v. Demoulin*, 249 F. Supp. 2d 1214, 1227-28 (D. Kan. 2003).

[102] Second Amended Complaint ¶¶ 38-53.

[103] Reply at 11.

the original copyrighted work (*Vengeance*) and that such copying involved *protectable elements* of the work. Because of this, the chain of distribution concept is triggered as to the Broadcaster Defendants.

"This approach may seem unfair to 'innocent resellers.' Nonetheless, the Copyright Act prioritizes recovery . . . to protect against insolvent or unavailable reproducers over fairness to downstream distributors."[104] Additionally, as ITN points out, a distributor may protect itself by diligent inquiry to avoid infringement, an indemnity agreement, or by insurance.[105] Under the facts alleged in the Second Amended Complaint, which add key allegations that were lacking in the first amended complaint, ITN has stated a valid claim for copyright infringement.

### The Second Amended Complaint Is Not Time-Barred, But ITN's Recovery Is Subject to the Three-Year Statute of Limitations

"Each time an infringing work is reproduced or distributed, the infringer commits a new wrong. Each wrong gives rise to a discrete 'claim' that 'accrue[s]' at the time the wrong occurs. In short, each infringing act starts a new limitations period."[106] "If infringement occurs within three years prior to filing, the action will not be barred even if prior infringements by the same party as to the same work are barred because they occurred more than three years previously."[107]

Accordingly, the Second Amended Complaint is not barred. But ITN's recovery will be limited to acts of infringement that occurred within three years of when the lawsuit was first filed. The lawsuit was first filed on October 13, 2015. Thus, ITN may not recover for acts of infringement that occurred on or before October 12, 2012. There is no need to re-plead the

---

[104] *Metal Morphosis*, 639 F. Supp. 2d at 1373.

[105] Opposition at 12 (citing *Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 308 (2d Cir. 1963)).

[106] *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S.Ct. 1962, 1969 (2014) (alteration in original).

[107] *Id.* at 1970.

copyright infringement claim as the Broadcaster Defendants have requested.[108] The Broadcaster Defendants cite to no authority supporting the proposition that the copyright infringement needs to be re-plead.[109]

## CONCLUSION

There are sufficient allegations in the Second Amended Complaint to withstand the Motion under Rule 12(b)(6). ITN has adequately alleged ownership and has adequately alleged copying. There exists a set of facts that, if proven, would provide entitle ITN to relief.

## ORDER

IT IS HEREBY ORDERED that the Motion[110] is DENIED.

Dated May 5, 2017.

BY THE COURT:

_____
David Nuffer
United States District Judge

---

[108] Reply at 12.

[109] *Id.*

[110] Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) ("Motion"), docket no. 53, filed Dec. 6, 2016.